Good morning everyone. Let me begin by first of all apologizing for the fact that we are getting underway late. I think our court generally does a pretty good job of starting on time and then we don't really pay attention to the clock strictly and giving people time to argue. I want no mistake made about who is responsible for this. I had a meeting at 8.30 here in the courthouse and it was of some import and it lasted longer than I thought it would. So I didn't want either of my colleagues to be held accountable for my inability to have been on time. Blame me if not you. I would have preferred a full disclosure. I was supposed to be in a meeting and I was sufficiently late to that and didn't show up at all. I wasn't going to tell these folks that, but now that you've admitted your guilt, you would have seen that I was on time, I'm sure. All right, we'll call the first case of Carlo et al. v. Pittsburgh Glass Works LLC. Mr. Cordes. Thank you, Your Honor. Mr. Court, my name is Samuel Cordes. I represent the appellants. I'd like to ask for two minutes for rebuttal if I may. Granted. The district court here precluded a disparate impact claim under the Age Discrimination and Employment Act because it fell on employees who were 50 and older, despite the fact that that didn't also fall on employees 40 and older. And that decision permeated all of the district court's decisions in this case leading up to that. Let me ask you something about the district court decision, Mr. Cordes. It goes specifically to Dr. Campion's testimony. I believe that the district court stated in his opinion, his later opinion, the summary judgment opinion, that Dr. Campion made two mistakes. First, that he included the e-mart terminis and also that he relied on the erroneous DUM rather than the agreed data set. Did Dr. Campion cure those deficiencies by way of supplemental report? And if so, did the district court speak to that cure in any way in the opinion? Yes and no. Yes, Dr. Campion dealt with the Everett, Michigan finding. What happened with the Everett, Michigan, Your Honor, is that they were later eliminated in an earlier reduction. The group tended to trend younger and skewed the data actually in favor of more of the defendants than in us. But then Dr. Campion did an analysis, and it really came out the same. But what did the district court do about that or say about that? The district court ignored it as far as I could tell from its opinion, Your Honor. And that's the other issue here. Oh, no, not another issue. But that's why we believe that what happened here was really permeated by the view of it over in 50. Even calling it data snooping, the district court said. Well, what is that, data snooping? Well, Your Honor, I looked it up in the dictionary. I googled it. I don't do dictionaries anymore. I mean, all I thought was Wikipedia. You have a problem with Dr. Campion looking at that for that. I believe what my colleagues can answer that better. But what the allegation was is that I'm picking, for example, age 55 as opposed to. Given the context, it seems to suggest perhaps the selection of some arbitrary lines in terms of age. That's correct. I don't know what it means either. That's probably close, Your Honor. It didn't happen in this case because what Dr. Campion said was that there was a disciplinary impact at the age of 50 or more. Now, there's a parade of horribles where, yes, you can do it that way, I suppose, and I think that's what the district court. I mean, isn't that, in fact, what can occur, which is not to say it occurred here, but is there not the potential for, whether it's called data snooping or whatever, the setting of certain arbitrary lines for purposes of, I mean, we had that, I believe, in that Petruska case, where you get the, what, 47.7 years old? Sounds kind of arbitrary. It does, Your Honor, except I think that's a function of what the statute says. You know, the statute says because of age. It doesn't say because of 40. Well, but that's not my question. I know what the statute says, and it clearly says because of age, and that's the problem the defendants have here, which is the textual issue. But doesn't 47.7 sound rather arbitrary? 47.7 sounds arbitrary. That's not your case. It's not my case, Your Honor. But it points to the potential here for mischief, doesn't it? It points to the potential that there could be mischief, Your Honor, and I think, you know, the fix for that is perhaps the statutory fix, but it's not a fix. So then why is 50 different than 47.7? Because 50 is older than 47.7. I mean, essentially that's the issue, Your Honor. The question, of course, in all of these is was it because of the person's, or in the case of an impact, did that impact fall greater on an older group of people? So that's the problem. It's not a problem. That's the nature of what happens in age discrimination. The size of the average American family, it's 2.54 people. I mean, I think when you deal with numbers inside of a planetary universe, that's the natural outcome. And I agree. And that's sort of why we think that really when we get down to it, most of what the district court did in all of the decisions here was to start with the premise that an age 50 impact can never occur, and from that, using different terms, using the term data snooping or using something, it permeated every decision here. And we think the district court was wrong. In your case, what about the lack of a meaningful 60-plus cohort? Your Honor, again, I think it's a red herring. What Dr. Champion did was looked at 60 and over, found out there wasn't a large enough set to do it. It was too small a set for any statistical significance. And I suspect, Your Honor, that that's going to happen in most cases, because as people get to be our age, or my age anyway, 65, 70, et cetera. His age. His age. As they get to be older, Your Honor, they disappear from the workforce. It's just a natural thing. So you're oftentimes going to have that situation. Some of the courts and some of the defendants talk about this notion of this oxygenarian. You're not going to have an 80-year-old not hiring in favor of a 70-year-old and the like. That's the nature of the statute, Your Honor. Excuse me. Go ahead. From a more pragmatic perspective, with respect to Dr. Champion, are you suggesting we remand it for an evidentiary hearing, a Dowertype hearing, or are you suggesting we have the wherewithal now to reverse the district court? No, Your Honor. I think it needs to be remanded because, first, the district court, the issue of law permeated the district court. In addition, Your Honor, just parenthetically, the district court did not conduct a Dowbert hearing. Right. There was no full-fledged Dowbert hearing in anything even approximately. Right. And this court has said fairly repeatedly that when something is going to be outcome-positive, and it's going to be outcome-dispositive in a disparate impact case, if you don't have a statistical expert, you're done. But that at least you need to have a hearing so that these issues of credibility can be determined. And really the district court, well, not really, the district court did not do that. So we're not asking for this court to resolve that issue, but I think a remand with instructions of the district court to look at it with this issue of law in mind. What did the district court say about the Bonferroni adjustment? Which, I mean, if we don't know what data snooping is, to me it sounds like something you do to a pasta of some kind. What is a Bonferroni adjustment? And what was done or what was said by the district court about it here? What the Bonferroni procedure is, Your Honor, again, I'm not a statistician. I know you're not a statistician. But when you have a group of multiple tests on the same data, one can do this Bonferroni to kind of correct for that. The courts that have addressed that say it's a conservative test that sometimes creates false positives. So his not doing it, you know, the defense expert raised that issue, the defense expert would have done that. I believe that's a credibility issue. It doesn't go to the issue of 702. And even, you know, the courts when we cited those in our brief have said it's a conservative thing. It doesn't necessarily have to be done. And the other thing is I think it's based on this false prospect because Dr. Campion did not do a look at a series of sets. What Dr. Campion did was look at, he changed it, if you will. He said 50 up, that's what I'm looking at. And that's where he found the disparate impact. So he wasn't looking at a group of 40, 45, 47.3, et cetera, where the Bonferroni might be relevant. Here it really would create a false positive because that's not what he did. My time's up if I go on. There's some important issues here. And we really haven't talked much beyond the statistical evidence and much about subgroup cognizability itself other than to touch on the textual plain language aspect of it. I mean, you would concede, I assume, two points. Number one, that there's not a case, a court of appeals case directly on point, that would say that subgroup is cognizable in a disparate impact case, right? In fact, if we were to hold such, we'd actually be creating the circuit split for whatever that's worth. That's kind of, I agree with what he's saying. We're not afraid to do that. So don't worry about conceding the obvious. And the reason I'm not afraid to concede the obvious, the only thing I would question is that the Sixth and Second Circuits, or I'm sorry, the Eighth and Second Circuits decisions, the Lowe and the McDonald-Douglas. And the Sixth. And the Sixth, which basically, I mean, just cited Lowe. First of all, Lowe was before O'Connor. It was before Smith when the Supreme Court even recognized a disparate impact. McDonald-Douglas saying. Okay, but I mean, how does, help us with how O'Connor helps you, because it was a disparate treatment case. The statute, Your Honor, I think it helps us because the statute, that statute, and the Supreme Court just said this in the inclusive housing case, I guess in the 2015. Justice Kennedy had a series, it was a fair housing case, but Justice Kennedy was analyzing both the ADA and Title VII and showing why it allowed, those two statutes allow a disparate impact. And he kind of said as much that if you look at 623A1 and A2, the language is both, it's used because of such an individual's age. So the difference between an impact and a treatment for what the statute means,  one allows, one requires sort of an intent, the other requires a disparate treatment. But the operative language, Your Honor, is to prime any individual because of such an individual's age. So I think that makes, I think that really the statutory, the statute language is going to be or should be construed identical. There is no difference in the operative language that makes O'Connell not. In fact, the language is the same for both the treatment case and the statutory language. Sure, and Justice Kennedy was saying there's nowhere in any post-O'Connor decision where any court has said the age discrimination case means because you're over 40 and that's what it protects. It protects because of age. In fact, what the district court did, and I think what both the Second and the Eighth Circuit did, was basically make the same mistake that the Courts of Appeals made pre-O'Connor. Because pre-O'Connor there was a fair amount of decisions that said the protected class is 40 and over and that's what you have to show. And so if you've got a prima facie case in a treatment situation of a 50-year-old and replaced by a 40-year-old, you don't even have to have a prima facie case in a treatment situation. Let me ask you about this decertification issue. We haven't touched on that at all. And the controlling opinion was written by the gentleman to my right. The Zavala case, how do you distinguish these facts from Zavala? I think Zavala, first of all, was a Fair Labor Standards Act case. With respect to the similarly situated plaintiffs, is that right? I think that that makes the factors of difference more important to proving the claim. In an ADEA case, in a RIF, the policy we're looking at is the policy we've identified that creates the disparate impact. In a Fair Labor Standards Act, as I understand Zavala, it was one subject, and then the court said in one subject of some common employer practice is not enough. And I think in the ADEA situation, I think that's exactly what we're, that's what Watson said, the Supreme Court decision in Watson. And even Dukes noted that in a situation where you have an impact case in a Rule 23 class, if it's a disparate impact case, it's a different kind of analysis. Is the district court really focused on the plaintiffs being similarly situated or not being similarly situated, right? And the district court here, yes, that's correct. And the district court here said that because it was, basically the RIF occurred in several individual locations. With different managers. With different managers. But the policy we identified, and, again, we have to identify for a disparate impact as part of our primary picture case, is just that. It's the situation very close to what Dukes had talked about, that there was this unbridled discretion for the local managers, and they didn't follow or weren't compelled to follow their own RIF rules.  But can we agree that Dukes' Rule 23 case really doesn't do anything for you here in this country? No, Your Honor. Those are the facts of Dukes, but those are also kind of the facts of this case. Well, I understand, but how does Dukes' Rule 23 case help you? No, it doesn't. It doesn't, Your Honor. The only reason we're talking about Dukes, though, is that Justice Scalia specifically in Dukes mentioned that in a disparate impact situation, that kind of a claim could go forward. Dukes was a disparate treatment case. And one of the things that Justice Scalia mentioned in that situation was, if this were a disparate impact case that you were alleging the same thing, that's a different issue, and in fact cited the Watson case in the Fourth Circuit just recently in the Brown case, kind of said the same thing, that when you've got an attack on a policy that is across the company, and it's based on sort of this unbridled discretion of local management and not following the rules, that impact claim can be challenged based on that. Judge McKee, I think you had options. Well, I'll say this to you. Some things you can think about, and I can ask you on rebuttal. That is, to what extent, if at all, did they demand to run amendments to Title VII where they specifically dealt with disparate impact, but they didn't touch the ADA? To what extent, if at all, we should factor that in? You have not mentioned the jurisdictional issue, which did not originally concern me on the minutes of appeal, but the more I've thought about it, the more concerned I've gotten about it, and that's some things I can kick around with you on rebuttal. Should I address that on rebuttal, Your Honor? On rebuttal. Okay. Thank you very much for your time. We'll have you back on rebuttal. Okay. I was going to butcher that badly. I was going to say, okay, repeat it, please, so I get it right. Anuel Acalino. Acalino. His name has more letters than his tongue has letters. And you started it. It's a good Italian name. I know that. Poco poco italiano. May it please the Court, I am Anuel Acalino for the EEOC as the NECAS. The commission weighed in on this appeal to address what I think is a central issue in appeal about the cognizability of subroute claims under the AJAC. And in answer to Judge Smith's question, we certainly urge this Court to embrace the opportunity to create a circuit split, because in our view, the three circuits that have disallowed subroute claims are incorrect. And I think if you give a studied analysis to the problem before you, you'll reach the conclusion the commission has, which is the text of the statute and Supreme Court precedent really dictate the conclusion that subroute claims are actionable. But you've not regulated at all on the question that we have before us. That's true. Miki, raise your point. So we don't have any kind of deference. We are not arguing for Chevron deference. Any kind of deference? I think Skidmore deference is appropriate. It's our established, well-established, long-standing view that subroute claims are cognizable. So now you're arguing that your brief gets deference? That's a new kind of argument to me. We've argued many times at EEOC that the positions that we put out in informal guidance or in our briefs could be entitled to Skidmore deference, which really itself just looks at have we offered a persuasive interpretation. I think that's the deference every brief gets. Well, I hope that you'll agree with us then that our brief is persuasive because we really start with the text of the statute. That has to be the starting point of your analysis. But what does it look like if you're right? I'm not suggesting you're not right, but I'm trying to get my mind about what would that world look like? Because any policy will have a disparate impact, potentially, on age groups. If you're looking at a big enough universe of folks, it's not going to be totally neutral, I wouldn't assume, on anyone. And I'm trying to figure out how it would work, and that's kind of what they're arguing. I'm trying to figure out how it would work in reality. If people who are 45 years and seven months come out looking one way under policy, and people who are 42 years old and six months come out looking a different way under policy, how do we draw the line and how do we get something that we can work with? I think you have to let the statistics draw the line, and I think that the concern about achieving statistical parity is overstated, and that's because it's so exceedingly difficult for a plaintiff to identify a specific employment practice that has a disparity, that is statistically significant, and there's enough data to make it reliable. So these scenarios, some of them I find implausible, about the 85-year-old versus a group of 70-year-olds who are favorably impacted. But if there were a case where the data played out and 47.7 is the age cutoff, and employees who are older than that were impacted statistically significant way, then that's actionable under the statute. And we get there because of the words of the statute and what the Supreme Court has told us those words mean. But haven't the defendants and the chamber amicus raised a very, very genuine and legitimate concern by suggesting that you can slice and dice this data any way you want to and create a subgroup? And if it's cognizable. Well, the subgroups that the plaintiffs and the EEOC envision don't have an upper boundary. We're talking about lower boundaries. So some of the amici that talk about that, that's incorrect that we think that it's going to be a 50- to 53-year-old subgroup that would be impacted. So to cut the data at 50, 55, 60. That didn't really answer my question, though, as to whether or not the data is manipulable in the way they have suggested. I don't see a case where it was manipulated in that way. And if the data panned out to show there was a statistically significant disparate impact on workers who are 49.3 years old, then that should be actionable under the statute unless the employer can establish its defense. That's what Congress decided to do when it enacted the statute and said that employees are protected because of their age, not because of their membership in a protected group. Did the district courts act as a gatekeeper with respect to this data manipulation by way of downward hearings? We did not weigh in about the specifics of this case and how it played out. Not in this case, generally speaking. So if the concern is that data can be manipulated and can be tailored to whatever number is convenient, could the district courts act as a gatekeeper in an effort to prevent that from happening by way of a downward hearing? I think that they could. I mean, district courts obviously have a gatekeeping function under Daubert. But here what Judge McVeary did was to say in a brief paragraph that just subgroup claims are not cognizable at all. Well, I understand what he did. But I'm saying, in a painting with a broader brush, if we were to recognize these subgroups as cognizable classes or claims, could the district courts then use their Daubert or gatekeeping functions to police this? Yes, I think potentially they could if they found there were problems with how the data pool was cobbled together and cherry-picking. Yes, I believe so. Before we have you sit down, would you speak to what you believe O'Connor says with respect to this case? And do so by taking into account the fact that I believe this appears on the EEOC website and states that O'Connor deals solely with the disparate treatment theory of discrimination. I think that's a direct quote. I'm not afraid of that direct quote. I didn't ask for your fear factor. I just wanted to know contextually what it means. I think the 10,000-foot picture from the air about what O'Connor is about is O'Connor says the AGE Act is about protecting individuals against discrimination based on age, not because of membership in a protected class. PGW and AMICI would have this case be only about whether there's an impact on the protected class. Now, why we rely on O'Connor, and I don't mind that it's just about disparate treatment, is that it's a basic tenet of statutory construction that identical words used in the same statute are intended to have the same meaning. If you look at the language of 623A1, the provision that bars disparate treatment, it says because of such individual's age, identical to the language of A2. And so the way that O'Connor read that was 631A, limiting the class's protection to those 40 and over. It only makes sense to read 623A2 identically to the way the Supreme Court did. I never seek to cause trepidation with any of my questions. All right, thank you. Thank you. Thank you very much. Mr. Becker. Mr. Becker, actually, the answer to the previous question to the amicus perhaps is a good place to start out, though it certainly won't constrict you going forward. And that is, I mean, the textual point here, how do you, how do the defendants avoid the because of age? The because of age question is one that's been addressed in several court rulings, including the Supreme Court in Gross, which found that you need to prove but for causation under the ADEA. And importantly, this Court's Musarski ruling, which found that a disparate impact claim under the ADEA requires a 40 to 70 class. It doesn't talk about this subdividing at all, but instead has very straightforward language in Musarski saying that the class is 40 to 70. So the issue is really whether or not it's okay to import disparate treatment concepts into disparate impact at every front. Now, I think we do. Why is every front the point here? I mean, why isn't the position of plaintiffs and the amicus with respect to O'Connor, I mean, right on. I mean, isn't it favorable treatment of younger protected employees utterly irrelevant when what you're trying to determine is whether an individual was classified because of an individual's age. In a disparate impact claim, you are using statistics to stand in for intent. You're using statistics as circumstantial evidence of intent. Correct. And in that instance, when you're dealing with a situation where you're not showing the evidence, then you need to have a way to deal with the fact that the plaintiffs are not all in the protected class. The issue on this case is that O'Connor says nothing about disparate impact. It only talks about disparate treatment. So what? It says something about, in fact, it cites the because of an individual's age of A1, and it's the same language, as amicus points out, that appears in A2. Well, Your Honor, respectfully, I don't believe that O'Connor speaks at all to the question of disparate impact, but this question that we're focusing on is something that this Court need not reach in this case. Though the appellants have taken the position that the Court's decisions were permeated by this over-50 question, the decertification does not turn on the over-50 question, and the barring of Dr. Campion's testimony does not turn on that question. Those questions were resolved based on applying Your Honor's well-reasoned opinion in Zavala and upon the issue of whether or not Dr. Campion was manipulating the data. Those issues, I mean, there were some answers that I would like to address to questions you asked about those points. Should the district court have conducted a Daubert hearing? Your Honor, in this instance, no. There was a very full record. And as Judge McKee reasoned in the Odie decision, which I believe Judge McKee was also on the panel for Padillas, in the Padillas case, there was virtually no record. In the Odie case, there was a fully developed depositions, opinions, responses, briefing. Everything was presented to the Court. That's what happened here. And I would like to respond to the point that… Before you do, and we'll certainly allow you to do that, you continue to emphasize that this is a disparate impact case and are seeking to use that as some kind of very substantial distinction. And I'm trying to figure out why that should make a difference when we have that same language in A1 and A2. And specifically, not only do we have that language, but I want to know why that language is not reinforced by what the Supreme Court said in Watson versus Fort Worth. Because there, the Court acknowledged that the two causes of action involve different factual context, but made the point that they share the same ultimate legal issue. Why doesn't that underscore the position taken by plaintiff with regard to the text? First, the ultimate legal issue in a disparate impact claim is modestly different than a disparate treatment claim. So in a disparate treatment claim, the plaintiff is going to need to prove intent on top of that there was some sort of favoring of a younger worker over them. In a disparate impact claim, you present the statistics, and then you're looking at the reasonable factors other than age and the ability to rebut that evidence. There's no difference there. The difference is the process by which you try to establish a proposition. But you're still looking at whether or not there's been an adverse action, quote, because of, close quote, age. And I don't see the distinction. The distinction is one of the difficulties of proof, it seems to me. And that's creating all kinds of problems, including this concept of data snooping, as I understand it. I don't pretend to understand it well. But you're still trying to determine whether or not the employer has taken an adverse action because of one's age. You said it's not one. It's because of a group of individuals who share a common characteristic. And I'm not sure the distinction is as great. The proof is monstrously different. That's the problem we're running into. So in substance, is it really any different? Well, in substance, Your Honor, the question is whether younger workers were favored over older workers. That is going to be an issue. But in terms of how you get to that and whether or not that's common to the ADEA, I don't know why that would be any different. Because, Your Honor, the ADEA is unique amongst the protective statutes. Title VII is usually dichotomous relationships. Either you fall into a protected class or you do not. You know, appellants constantly are referring to the issue of the continuum of age growing as you age. There's a whole range of possible factors. That point is not addressed in any of the case law that's been discussed, and it's not actually addressed in the statute itself. No, I'm just saying, Your Honor, the ego that is subject to the ADEA is exactly that. I guess the problem is one can't define. You can define whether someone's male or female or black or white. And so those types of projections are much easier to apply. In terms of age, I guess that's where Greenwald's testimony would have gone to. I'm not suggesting that we should necessarily do anything about that. But that's exactly the kind of implicit bias that impacts negatively on a group of which persons who are adversely impacted are beyond a certain point. They're seen as being less capable than younger. That's the whole purpose of the disparate impact. And when I think of because of age, it's hard for me to divorce the disparate treatment from the disparate impact except for the incredibly difficult problems of proof that have brought us here in this case. And, Your Honor, I would agree with the incredibly difficult problems of proof here and the fact that other courts that have looked at the same issue have found the lack of guidance in the statute itself beyond the because of age language to be problematic for the proof point. At this point, all that Congress has done is to define the protected class and then the courts have found that a disparate impact claim exists. The problem that needs to be resolved with regard to the over 50 cases is one that is not addressed by the statute itself. So we're looking at a very straightforward statute but applying it in a very difficult manner. Well, you say it isn't addressed by the statute. It isn't addressed if what one would expect Congress to have done is said more than because of an individual's age and gone on perhaps to speak to subgrouping or subclasses as you'd find in Rule 23. But why with plain text like this would Congress have to do that? Your Honor, because of the difficulties that we're experiencing. Okay, let me ask you another question because it hasn't been addressed so far and that is how do you respond to the impact of Teal? I don't think Point has relied upon Teal but the amicus brought up Teal in their brief and it provides at least an interesting scenario here to consider because the court clearly was saying that the kind of bottom line treatment that resulted here didn't obviate the presence of the disparate impact, didn't in any way obviate the presence of some kind of discrimination. Doesn't it strengthen the position of the plaintiffs? Your Honor, the issue in Teal was this two-step approach where the company had first done a disparately impactive action and then attempted to fix it in a secondary action. Right, but what I'm trying, how you can help me on this is to try to understand why that matters. This is the two-step approach that the court was dealing with in Teal is important here analytically. Because here there is no two-step issue. Either there is disparate impact within the group that is affected or there is not. There's not a template. I know that there were some matters that you wanted to address and respond to that we've probably not given you an opportunity to do and I don't want to trample on your time to the extent that you can't do that. Well, I'm actually out of time. He's still in your life raft. We control the clock. I'm colorblind. I would like to quickly address one of the issues that Judge McKee raised, which is the question of jurisdiction. I think there's a problem here with regard to jurisdiction, particularly with regard to all the plaintiffs other than Mr. Carlo. And at the time of the appeal, Mr. McClure, who has now settled his claim and is no longer relevant to the case, at the time that the notice of appeal was filed, no other names appeared on the caption or in the appearances. Importantly, no other names appeared until more than 46 days after the notice of appeal was filed. And even at that time, to the point of the filing of the appellant's brief, there was no mention of the opt-in plaintiffs. All of the opt-in plaintiffs in this case had opted into the class and consented to representation by counsel in this case. Their claims were dismissed as part of the decertification ruling. However, none of them ever appeared. Now, looking back to the Torres case, which was addressed by the amendment to Rule 3, the very issue in the Torres case, and the reason they expanded the wording that could be utilized in a notice of appeal, was that in the Torres case that had been an intervening class member who had appeared in the case, and his name never appeared and was never used at all anywhere. So now it's very liberal as to what language can be used. There's no at all here? There's no at all that was used until this brief, which now says, Rudolph Carlo et al. Instead, it was just plaintiffs in the above-captioned case. So quite frankly, from our perspective, we believed that the opt-in plaintiffs were not in the case until very deep into the appeal process. So under Rule 3, and the committee notes to that rule, the question is whether there was an objective indication that those people intended to appeal. There was no objective evidence at all in this case until the brief. Now, addressing some of the points on the Campion report that were brought up. Well, how do you do that? I guess you're arguing that prejudice doesn't matter because it's a jurisdictional rule and it says what it says. And you're arguing, I guess, that there is some prejudice in the economy there. But if prejudice is relevant, it may not be. What is the prejudice? What is the prejudice? What is the prejudice if this jurisdiction is to those other than Carlo? Well, you mean prejudice to PGW? Right. PGW made plans for participating in the court-ordered mediation process based on the expectation that the groups that were involved were solely at minimum the named plaintiffs at that point, and these opt-ins were out of the case. And it wasn't until that process that we learned at all that the other side was still representing these opt-in plaintiffs. So we had planned for how we were going to deal with the appeal well into the process and even went in to participate in a mediation session without knowledge of what they were intending to do. It's very problematic. I don't believe that prejudice is an issue because it is a jurisdictional one. But you think it's violent of Rule 3C, is that correct? Correct. Now, addressing some of the points on the Campion report, I believe that Mr. Cordes claimed that Dr. Campion had cured his issues in his report. That is based on one sentence of testimony at his deposition where he was asked, have you ever looked at it? Correct. And he said, oh, yeah, I did, and there's no difference. That is the hallmark of an Ipsit-Dixit opinion with no explanation. But wouldn't you agree that the district court gave it the most peremptory of treatment? I would disagree, Your Honor. The amount of time that was spent in both argument and in briefing on this issue was extensive. Well, but for our purposes, in reviewing Judge McVeary's opinion, there ain't much analysis there to look at. It's a pretty straightforward decision. However, the decision- There's a difference between truth and straightforward. I think I'm agreeing with that. It is a brief explanation. The decision straightforwardly walks through the Rule 702 and Daubert considerations here. And the issue that we have, and just one to focus on, is this question of the individuals who were employed at this EVARD facility. Even in the testimony that Dr. Campion provided, he said, I excluded them all. That's still wrong because six of those individuals kept their jobs. They were employed at the company. He appears to have refused to recognize facts that were presented to him in letter form. You know, we worked to get to an agreed-upon data set. They say that's the end. The data set that was provided to them had more than adequate explanation of individuals who were actually terminated and individuals who actually remained employed. If an expert chooses to ignore the undisputed facts in a case, that's not okay. That needs to be, and particularly with the problems that we've been talking about here with potential of data snooping and trying to identify, you know, respectfully, Your Honors, if you intend to address the issue of over 50, this is not the case to do it. Dr. Campion's approach was reckless with regard to the facts. That bomb-throwing adjustment that was talked about, every case that plaintiffs cite in their brief regarding adjustments says, particularly in the footnote that they put in their reply brief, says that an A correction is necessary. It's statistically accepted that you correct, and what this correction is. Statistically required. Statistically accepted is statistically required. Statistically required. If you are going to do multiple looks at the same data set, statistics require you, to use Dr. Rosenberger's phrasing, to pay for that. You can't keep slicing and dicing and investigating the same data set and not adjust the level that you're going to, the level at which you're going to find statistical significance. And that statistically helps to promote the correctness. You're attacking reliability here, right? Yeah. You're attacking reliability of the expert, right? Reliability, yes. Yeah. All right. Haven't we said, this Court said it in TMI, that the standard for reliability is not that high? I mean, we're not talking about a merits determination, eventually, as to reliability. We're talking earlier on at the admissibility stage. That not that high level, respectfully, needs to be at least that they recognize the facts before they're going to use sufficient data. All right. Thank you very much, Mr. Becker. I believe now we hear from the Chamber amicus, Mr. Mullen. Mullen. You can't even get Mullen right. Mullen? Mullen? My family has mispronounced its own name for decades, Your Honor. You got it right. My family has not mispronounced our name, but that's probably no surprise to you. Good morning, and may it please the Court. My name is Neil Mullen. That's how it's pronounced, and I'm here on behalf of the Chamber. I'd like an opportunity at some point, before I sit down, to address the question whether this panel actually has an occasion to rethink the prima facie case that was established, codified in the SARS-CoV-2. But before I do that, I'd like to jump straight into the three things that I heard this morning that are troubling Your Honors about the Chamber's position and the defendant's position on this subclass or segmentation. First, let's talk about the plain language, because we think the plain language is actually very strong in our favor. It's true that the language says because of age, but that suggests or requires a showing of causation. Now, let's go to the facts of this case. When you look at this data set from 40 and above, there's no statistically significant adverse result. There's also no statistically significant adverse result 60 and above. Now, I recognize there's a dispute about the size of the data set, but again, from our position, we're talking about how this is going to work going forward as opposed to perhaps. We're talking about adverse results. I don't see that as causation. Okay, I'm getting there, Your Honor. Okay. So if the plaintiff is able to manipulate the data set, pick 47.7 as the bottom end, sort of use an infinitely variable opportunistic baseline for the analysis, then what you end up with is a situation in which, or could very well, and I think did in this case, end up with a situation in which the entire 40-plus protected class is not adversely affected. But aren't you, in making that argument, really asking us to use the statute as a kind of proxy for evidentiary standards? I mean, aren't you effectively saying, use EBEA to fill in an evidentiary role? I mean, I see much of your argument as being a policy-based argument, and if it is, isn't the pushback to that that the good old rules of evidence and Gobert and the gatekeeping role of the district court can take care of that? No, Your Honor, and for two reasons. First of all, if we are wedded to, and we are in the language of the statute, requiring causation, it must be an adversity because of age. If you have a situation in which there are a great many people affected by a particular performance or employment policy in the 50-58 cohort, and the most senior employees in the workforce are not adversely affected, and the most junior employees in the protected group, 40 and above, are not adversely affected. But this narrow band, 50-57, I forget what numbers I used, 53-57, is so large, and the impact on them is so large that doing a 53 and above analysis gives you an answer of statistically adverse results for 53 and above. What you're actually finding is not that they were adversely affected because of age. It's confusing correlation with causation. These people were 53 and adversely affected, not 53 and adversely affected because of their age. You know, you get to a point, I've thought about that a lot, I've heard that a lot. One can get to the point where the correlation becomes so strong, let's say statistically the correlation is a one, to use statistical terms, and that one applies to a big enough N, a data set, that it establishes that it's more likely than not that the correlation is tantamount to causation. The correlation is so strong that there's no deviation from the one, and therefore the only way to establish this kind of correlation, consistent correlation, to get to the one is causation. So it doesn't always diverge, correlation or causation. No, there's no question that correlation can occur on a parallel path with causation. There's no question. However, the statute requires that the plaintiffs, when making their prima facie case, show that they were adversely treated because of their age. And if you have a situation, and I'm going to invent some numbers that are wildly unrealistic, just to illustrate my point. Let's say that there are 1,000 people ages 50 to 55, and 150 people ages 56 to 80. The people 56 to 80 are statistically significantly older. That is, they were ripped, in this case, at a rate lower than the younger workers in the workforce. But the people who were in that narrow band were adversely treated to a three standard deviations or four standard deviations level. If you use the lower bound of that age group, 53 and above, and run a statistical test, it's going to give you a two plus standard deviation result. It's going to tell you that there's an adverse result. But under those facts, you cannot say that this was discrimination because of age. Now, let me go to Judge Restrepo's point. Why can't we just handle this at a Dalbert stage? Why isn't this an evidentiary question? I think this is similar to what you were asking, Judge. The preamble to the ADEA, which is law, passed as a statute signed by the president, says that the purpose, one purpose of the statute, is to help employers root out age discrimination. Now, the chamber is an organization of thousands and thousands of businesses that want to comply with the statute. When they're rolling out a reduction in force or a new evaluation tool or some compensation metric, some compensation program, the great majority, they say, well, I haven't done the analysis. A lot of them, I can safely say that, will do adverse impact testing on it. They will see, how is this working? And there actually is software available that you can load all the data into it and it will come back with red flags. An employer wants to know ahead of time, have we done anything wrong? And you make that point in your amicus brief. Your time is up, and we're, on this court, pretty flexible, but we're more flexible with the parties than we are with Amici. When you started, you indicated there was a point that you wanted to make, so I'd like to give you the opportunity to address that. Three points and two sentences each. Mussorgsky's controlling on this jurisdiction. This court has said the prima facie case is to compare those who are in the protected class, 40 to 70 at that point, it's now 40 and above, and those outside the protected class. I'm not sure that this panel has the authority to say, forget about that, now we've got this movable standard. That's number one. Number two, O'Connor. O'Connor was a case in which the court was trying to figure out how the McDonnell-Douglas against Greene inferential proof scheme works under the Age Act. They said, it's because of age, if I deny you a position just because you're one year older than someone else, that's a violation of the statutes, disparate treatment. What they were trying to get at is how big a gap between the favored employee and the disfavored employee is enough to raise an inference under McDonnell-Douglas against Greene. It was entirely a case about an inferential proof scheme. It has nothing to do with disparate impact, and as we pointed out in our brief, most of the judges who participated, or four of the justices who participated in that decision, didn't think the disparate impact analysis is actually available under the Age Act. Finally, Thiel. In both that case and we believe this case, the prima facie case is established by showing that people inside the protected class are treated adversely vis-a-vis people outside the protected class. The district court there dismissed the case because the defendant showed down the road the numbers, it all came out in the wash. The Supreme Court did two things. First of all, it said, once the prima facie case is established, you're liable. And those people who are screened out by the process, they get relief. And that's the second point. The employer can't, as an affirmative defense, come in and say, just because Fred was positively treated, I don't have to pay Sally, who was adversely treated. It has nothing to do with this case. In both, the prima facie case compares those inside the protected class to those outside the protected class. Thank you, Mr. Martin. Thank you, Your Honor. Cordes will have you back for a rebuttal. Thank you, Your Honor. At least got your name right, Mr. Cordes. In fact, everybody was pronounced as Martin. Could you answer Judge McKee's question about why we have jurisdiction? I want to, Your Honor. Your Honor, the notice of appeal specifically references Judge McVeary's Rule 54 order. It's attached to it, I think. Yes, it was. Judge McVeary's Rule 54 order, certified, created as a final decision, both the summary judgment motion, because it was an outstanding retaliation case, both that, the statistical analysis of the expert things, and the class certification issue. And the names that are there are Carle and McClure, only Carle and McClure. That's correct, Your Honor. And at the time, that was what the district court's caption was put in. It's on the docket as those two people. But at the time, and Judge McVeary was pretty thorough and long, the opinion dealing with the Rule 54 addressed, he said, you can take this order, create this for final purposes, the class certification issue. And we need to do that because unlike Rule 23, there's not an immediate, some Rule 23, there's not an immediate appeal. So that's why we believe under Rule 3, the court has discretion and it's not. Rule of Appellate Procedure 3C1A provides that the notice must specify each party taking an appeal, but an attorney representing more than one party may describe those parties with such terms as all plaintiffs, the defendants, and variations of that kind. So here, don't we have each of the named plaintiffs represented by the same counsel? That's correct, Your Honor. And the notice of appeal here I think says plaintiffs here by appeal. Correct. Why would that not be the equivalent of, say, the defendants? I think it is, Your Honor. I thought you'd agree with me. I'm the most agreeable person. That's because he can pronounce your name. And so for the party issue, Your Honor, that would be our argument on that, that it's clearly referenced in Judge McVeary's. I mean, we asked Judge McVeary to certify those issues. If that wasn't an issue we were intending to appeal, it wouldn't be. It was clearly that turlock where they brought the whole name. And he brought the whole name. Name, judge, court, everything. Sure. And on the issue, I mean, I know that really the issue is on the notice of appeals not raised. But this Court recently in the TAP case kind of talked about whether, you know, once we appeal on the final order, all other orders are kind of at issue. Mr. Cordes, I believe we'll have to cut it off at this point. Okay. We thank all of counsel. Judge McKee and I actually have a meeting to get to. Maybe he will deign to attend this one. Other appointments? Yeah. In any event, we thank all of counsel for excellent briefing in the case and for very helpful arguments. I'm going to ask that there be a transcript of the argument prepared and that counsel share the cost of it. We'll take the matter under advisement and we will recess until I believe noon. Thank you very much. Thank you.